1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9   JOSE ALFREDO GONZALES,                    1:11-cv-01644-BAM (HC)

10                        Petitioner,         ORDER DENYING PETITION FOR WRIT OF
                                              HABEAS CORPUS, DIRECTING CLERK OF
11          v.                                COURT TO ENTER JUDGMENT IN FAVOR
                                              OF RESPONDENT, AND DECLINING TO
12                                            ISSUE A CERTIFICATE OF APPEALABILITY
     BRENDA M. CASH,
13                                            [Doc. 1]
                          Respondent.
14   _____/

15

16          Petitioner is proceeding pro se with a petition for writ of habeas corpus pursuant to 28

17   U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction

     of the United States Magistrate Judge.  Local Rule 305(b).
18

19                                        BACKGROUND

20          On September 29, 2006, the Kern County District Attorney filed an information charging

21   Petitioner with the following offenses: count one-rape (Cal. Penal Code[1] § 261(a)(2)); counts two

     and four-penetration with a foreign objection (§ 289(a)); count three-sodomy (§ 286(c)(2); count
22
     five-assault by means of force likely to produce great bodily injury (§ 245(a)(1); count six-torture
23
     (§ 206); and count seven-attempted murder (§§ 664/187(a)).  Counts one through four included
24
     the following allegations: Petitioner committed the offenses during the course of a burglary (§
25
     667.61(d)(4) & (e)(2)); he inflicted great bodily injury on the victim (§§ 667.61(e)(3) & 12022.8);
26
27

28
     _____

     [1] All further statutory references are to the California Penal Code unless otherwise indicated.

and he inflicted torture on the victim (§ 667.61(d)(3)).  Counts five, six, and seven included an allegation that Petitioner inflicted great bodily injury on the victim.  (§ 12022.7).

Following a jury trial, Petitioner was found guilty of counts one, two, six and seven.  The jury found Petitioner not guilty of counts three and four, and guilty of the lesser included misdemeanor offenses of battery and assault (§§ 243(a) & 240) on both counts.[2]  As to counts one and two, the jury found the burglary special allegations not true, but found the great bodily injury allegations and the torture allegation true.

On July 24, 2008, Petitioner was sentenced to a determinate term of nine years for count seven, staying the great bodily injury enhancement.  The court imposed a term of twenty-five years to life for count one, with a five-year enhancement for the great bodily injury allegation associated with count one.  The court stayed punishment on counts two and six, and stayed the bodily injury enhancement as to count two.

Petitioner filed a timely notice of appeal.  On February 1, 2010, the Court of Appeal, Fifth Appellate District affirmed the judgment.

On March 11, 2010, Petitioner filed a petition for review in the California Supreme Court.  The petition was denied on April 14, 2010.

On December 17, 2010, Petitioner filed a petition for writ of habeas corpus in the Kern County Superior Court.  On February 8, 2011, the petition was denied in a reasoned decision.  On January 13, 2011, Petitioner filed a document entitled "Motion to File Amended Writ of Habeas Corpus," which the Superior Court rejected for lack of jurisdiction by March 11, 2011 order (citing In re Clark, 5 Cal.4th 750, 767 n.7 (1993) (the denial of a habeas petition is a nonappealable order); In re Hochberg, 2 Cal.3d 870, 876 (1970)).

On March 12, 2011, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which was denied on August 24, 2011.

///

///

---

[2] The district attorney dismissed count five on June 10, 2008.

1    Petitioner filed the instant federal petition for writ of habeas corpus on September 23,

2    2011.  Respondent filed an answer to the petition on December 19, 2011, and Petitioner filed a

3    traverse on January 24, 2012.

4    STATEMENT OF FACTS[3]

5        [Petitioner] and K.I. were in a relationship for over two years before it
     ended.  But [Petitioner] continued to call her and would show up uninvited at her
6    home and office.  One night, K.I. was asleep when she awoke to find [Petitioner]
     naked in her bed with her.  K.I. had sex with [Petitioner] because she was afraid to
7    refuse him.

8        A week later, on July 7, 2006, K.I. was at home ready to go to sleep when a
     man named Eddie called her.  She had gone out with him several times recently
9    and his phone number was entered into her cell phone.  Eddie wanted to go out, but
     K.I. declined and went back to bed.  She awoke to again find [Petitioner] naked on
10   her bed.  K.I. asked him to get dressed and leave.

11       [Petitioner] then asked K.I. who Eddie was and punched her in the face.  He
     then pushed her back onto the bed, punched her repeatedly, threatened her, choked
12   her, and kicked her to the point she thought she was going to die.  [Petitioner] raped
     and sexually assaulted K.I.  She eventually blacked out and, when she came to, she
13   escaped and ran to the neighbors next door.  K.I. was taken to the emergency room,
     where she was treated for multiple abrasions, a fractured rib, a collapsed lung,
14   compressed spinal column, concussion syndrome, a facial fracture, and
     subconjunctival hematoma.
15
         [Petitioner's] defense was that K.I.'s injuries were not as serious as she
16   claimed and that she was the one who invited him to her apartment on the night of
     the assault.  According to [Petitioner], the two went to bed, but he was not in the
17   mood to have sex.  The two fell asleep, and when she awoke, K.I. asked him what
     he was doing in her bed and ordered him to leave.  K.I. took a swing at [Petitioner]
18   before he hit her with his fists.

19       [Petitioner] acknowledged that he hit K.I. "[v]ery hard," for "[t]wo or three
     minutes," that he grabbed her by the throat, grabbed her by the hair, and yelled at
20   her, but he denied that he threatened to kill her.  He was then sorry for what he had
     done and looked for K.I.'s gun so that he could kill himself.
21

22   (Ex. A, to Answer, at 2-3.)

23   DISCUSSION

24   I.   Jurisdiction

25       Relief by way of a petition for writ of habeas corpus extends to a person in custody

26   pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

27   _____

28       [3] These facts are taken from the unpublished opinion of the Court of Appeal, Fifth Appellate District on
     direct appeal and are presumed to be correct.  28 U.S.C. 2254 § (d)(2), (e)(1).

or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>,

529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed

by the U.S. Constitution.  The challenged conviction arises out of the Kern County Superior

Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C. §

2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

<u>Lindh v. Murphy</u>, 521 U.S. 320, 327 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir.

1997), <i>cert. denied,</i> 522 U.S. 1008 (quoting <u>Drinkard v. Johnson</u>, 97 F.3d 751, 769 (5th Cir.

1996).  The instant petition was filed after the enactment of the AEDPA and is therefore governed

by its provisions.

II.     <u>Standard of Review</u>

Where a petitioner files his federal habeas petition after the effective date of the Anti-

Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that

the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;
> or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "Federal habeas relief may not be granted for claims subject to § 2254(d)

unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly

established in the holdings of [the Supreme] Court."  <u>Harrington v. Richter</u>, __ U.S. __, 131 S.Ct.

770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and <u>Williams v. Taylor</u>, 539 U.S. 362, 412 (2000).

Habeas relief is also available if the state court's decision "involved an unreasonable application"

of clearly established federal law, or "was based on an unreasonable determination of the facts" in

light of the record before the state court.  <u>Richter</u>, 131 S.Ct. 785 (citing 28 U.S.C. § 2254(d)(1),

(d)(2)).  "[C]learly established ... as determined by" the Supreme Court "refers to the holdings, as

opposed to the dicta, of th[at] Court's decisions as of the time of the relevant state-court

decision." <u>Williams v. Taylor</u>, 529 U.S. at 412.  Therefore, a "specific" legal rule may not be

inferred from Supreme Court precedent, merely because such rule might be logical given that

precedent.  Rather, the Supreme Court case itself must have "squarely" established that specific

legal rule.  <u>Richter</u>, 131 S.Ct. at 786; <u>Knowles v. Mirzayance</u>, __ U.S. __, 129 S.Ct. 1411, 1419

(2009).  Moreover, the Supreme Court itself must have applied the specific legal rule to the

"context" in which the Petitioner's claim falls.  <u>Premo v. Moore</u>, __ U.S. __, 131 S.Ct. 733, 737

(2011).  Under § 2254(d)(1), review is limited to the record that was before the state court

adjudicated the claim on the merits.  <u>Cullen v. Pinholster</u>, __ U.S. __, 131 S.Ct. 1388, 1398

(2011).  "A state court's determination that a claim lacks merit precludes federal habeas relief so

long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

<u>Richter</u>, 131 S.Ct. at 786.

     "Factual determinations by state courts are presumed correct absent clear and convincing

evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court

and based on a factual determination will not be overturned on factual grounds unless objectively

unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."

<u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254

apply to findings of historical or pure fact, not mixed questions of fact and law.  <u>See</u> <u>Lambert v.</u>

<u>Blodgett</u>, 393 F.3d 943, 976-77 (2004).

     Courts further review the last reasoned state court opinion.  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501

U.S. 979, 803 (1991).  However, "[w]here a state court's decision is unaccompanied by an

explanation, the habeas petitioner's burden still must be met by showing there was no reasonable

basis for the state court to deny relief."  <u>Richter</u>, 131 S.Ct. at 784.

III.   <u>Ineffective Assistance of Counsel</u>

     In Ground One, Petitioner contends that trial counsel was ineffective for failing to order

DNA testing of a toilet plunger during pre-trial discovery.  Petitioner raised this claim in a petition

for writ of habeas corpus filed in the Kern County Superior Court.  The petition was denied in a

reasoned decision and the California Supreme Court denied the claim without comment.  Thus, this

Court looks to the "last reasoned decision" of the Kern County Superior Court for purposes of

1  AEDPA review.  <u>Delgadillo v. Woodford</u>, 527 F.3d 919, 925 (9th Cir. 2008); <u>Ylst v. Nunnemaker</u>,

2  501 U.S. at 803.

3           The Kern County Superior Court denied the claim as follows:

4           Petitioner contends his counsel, Douglas Moffat[,] was ineffective for failing
   to order DNA test[ing] to ensure that there was vaginal fluids on the foreign object.
5  Petitioner and the victim, K.I. had been in a dating relationship.  Things went
   smoothly for the first six months, but then the victim expressed intention to break
6  off the relationship.  On July 8, 2006, petitioner entered the victim's house
   uninvited and got into her bed.  When asked to leave after being woken up from a
7  sound sleep, petitioner became irate accusing her of wanting to have relations with
   another man named Eddie.

8
           In fact, Eddie Sanchez did not go out with [the victim] that night because
9  [the victim] wanted to go to sleep early.  The evidence established that petitioner
   not only refused to leave, but repeatedly punched, kicked and choked the victim to
10 unconsciousness, all the while raping and sodomizing her with his finger and penis.

11          The victim received numerous injuries as a result of petitioner's actions such
   as a punctured lung from broken ribs, a fractured skull, a fractured eye socket, and
12 numerous abrasions.  The victim's eyes [] were swollen shut[.] The victim sought to
   defend herself by kneeing petitioner and hitting him with a nunchuku.  The victim
13 tried to escape at least twice.  The petitioner pulled her by the hair and repeatedly
   punched her.  According to the appellate opinion, petitioner stated he wanted the
14 victim to know what it felt like to be raped and violated.

15          The petitioner admitted to digitally penetrating the victim with his finger,
   and raping her, although he could not ejaculate during a tape recorded interrogation.
16
           The victim tried to barter with petitioner indicat[ing] that if he called an
17 ambulance, she would attribute the injuries to two unidentified black males.
   Petitioner rejected this offer.  The victim was able to escape and received assistance
18 from the neighbor.  Petitioner contends he does not remember what happened
   because he "lost his head: due to outrage [of] the victim's termination of the
19 relationship.["]

20          Petitioner rendered his version of events to Det. David Marshall.  He
   realized that he injured the victim badly, and wanted to kill himself, but was
21 prevented from doing so by his sister.

22          To prevail on a claim of ineffective assistance of counsel, petitioner must
   show that counsel's conduct fell below professional norms causing prejudice.  In the
23 absence of such prejudice, it would be probable of a change in the outcome.
   <u>Strickland v. Washington</u> (1984) 466 U.S. 668, 694, <u>People v. Pope</u> (1979) 23
24 Cal.3d 412, 423.

25          Petitioner fails in this argument because DNA evidence would not exclude
   petitioner as the rapist.  <u>Tipor v. Superior Court</u> (1997) 42 Cal.App.4th 1359, 1370.
26 Where there has been a fair trial, petitioner does not receive DNA testing at state
   expense as [a] matter of right.  <u>District Attorney Third Judicial District v. Osborne</u>
27 (2009) 129 S.Ct. 2308, 2320.  Upon a fair trial, the presumption of innocence
   disappears.  <u>Id</u>.  Petitioner admitted to digitally penetrating the victim with his
28 finger and penis.  There were copious amounts of blood in the bedroom resulting

                                        6

from petitioner's repeated assaults.  His injuries were minimal consisting of scratches from the victim defending herself designed to connect petitioner to the crime.  The medical examination linked petitioner to the crime.

There were neighbor's reports of the extent of the victim's injuries to law enforcement when they arrived on the scene.  Petitioner's admissions of penetration with his finger and penis rendered any DNA examination superfluous.

The overwhelming evidence points to the enormity and viciousness of the crime.  Petitioner cannot demonstrate innocence.  Cooper v. Brown (2007) 510 F.3d 870, 885 (9th Cir.).  Petitioner cannot demonstrate ineffective assistance of counsel or any prejudice at his counsel's hands.  Given the paucity of favorable evidence to petitioner, a jury could not do otherwise than convict him.  Strickland v. Washington (1984) 466 U.S. 668, 694.

(Ex. B, to Answer, at 1-3.)

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances.  Id. at 688; Harrington v. Richter, 131 S.Ct. at 788 ("The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

1  ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

2  1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance was

3  unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there

4  is a reasonable probability that, but for counsel's unprofessional errors, the result would have been

5  different.  It is not enough "'to show that the errors had some conceivable effect on the outcome of

6  the proceeding.'"  Richter, 131 S.Ct. at 787 (internal citation omitted).

7        A court need not determine whether counsel's performance was deficient before examining

8  the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S.

9  668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove prejudice, any deficiency that

10  does not result in prejudice must necessarily fail.  Ineffective assistance of counsel claims are

11  analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000).

12  Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

13        In this instance, the state court reasonably applied the clearly established Supreme Court

14  precedent and found defense counsel was not ineffective.  There is no showing that DNA testing

15  would have been anything other than futile because it would not have excluded Petitioner as the

16  rapist.  The evidence against Petitioner was strong, including Petitioner's admission that he

17  digitally penetrated the victim with his finger and penis and repeatedly assaulted the victim

18  resulting in serious injury.  In addition, the medical examination linked Petitioner to the offense.

19  Counsel reasonably could have concluded that there was no realistic chance that DNA testing

20  would have been beneficial to Petitioner's defense.  Moreover, Petitioner has not presented any

21  evidence to support a contrary conclusion.  Accordingly, there is simply no basis for finding that a

22  DNA test would have excluded Petitioner as the rapist, and there is no basis for finding either that

23  his counsel was obligated to seek DNA testing or that Petitioner was prejudiced by counsel's

24  failure to do so.  See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which

25  are not supported by a statement of specific facts do not warrant habeas relief.")

26  IV.    Ineffective Assistance of Appellate Counsel

27        In a related claim, Petitioner asserts appellate counsel was ineffective for failing to raise the

28  aforementioned issue regarding trial counsel's representation.  Petitioner first raised this claim in a

8

motion to file an amended writ of habeas corpus.  The trial court construed the motion as a motion

for reconsideration of the denial of the first habeas corpus petition, and denied the motion stating:

> The court has read and considered the additional evidence received by this court dated January 13, 2011.  The petition was denied and a copy of the minute order was sent to petitioner on February 8, 2011. [¶] Petitioner presents no new evidence to warrant this court to change its position.  The petitioner cites no authority, and the court is aware of none, permitting this court to reconsider the petition for writ of habeas corpus. *In re Clark* (1993) 5 Cal.4th 750, 767 n.7 [the denial of habeas petition is a nonappealable order]; *In re Hochberg* (1970) 2 Cal.3d 870, 876.  Petitioner may appeal to a higher court.  *In re Crow* (1971) 4 Cal.3d 613, 621 n.8.

LD 13.)  Petitioner then presented this claim to the California Supreme Court by way of habeas

corpus petition.  The petition was denied without comment.  Thus, this Court looks through the

silent denial to the last reasoned decision of the Superior Court.

The standards set forth in Strickland also govern claims of ineffective assistance of

appellate counsel.  See Smith v. Robbins, 528 U.S. 259, 285-286 (2000); Bailey v. Newland, 263

F.3d 1022, 1028 (9th Cir. 2001), cert. denied, 535 U.S. 995 (2002).  Appellate counsel has no

constitutional obligation to raise all non-frivolous issues on appeal.  Pollard v. White, 119 F.3d

1430, 1435 (9th Cir. 1997).

Appellate counsel's failure to raise trial counsel's alleged ineffectiveness was neither

unreasonable nor prejudicial.  Petitioner cannot demonstrate appellate counsel was ineffective for

failing to challenge trial counsel's alleged ineffectiveness because there is no merit to such claim,

as explained above in section III.  For the same reason, Petitioner cannot show prejudice.  See e.g.,

United States v. Baker, 256 F.3d 855, 863 (9th Cir. 2001) ("[The defendant] cannot satisfy the

*Strickland* standard for ineffective assistance because counsel's failure to raise any of these issues

neither fell below an objective standard of reasonableness nor prejudiced the defendant.  Counsel

merely declined to raise several weak issues, none of which presents a reasonable probability that

[the defendant] would have prevailed on appeal.").  Therefore, habeas corpus relief is foreclosed.

V.      Insufficient Evidence to Support Conviction For Torture

Petitioner contends there was not sufficient evidence to support his torture conviction.  The

///

California Court of Appeal, Fifth Appellate District denied the claim in the last reasoned decision stating:

> [Petitioner] contends the evidence is insufficient to support his torture conviction.  Conceding that his argument is not supported by existing law, he asks that we rely on dissenting opinions in *People v. Jung* (1999) 71 Cal.App.4th 1036, 1043, 1049 (dis. opn. of Armstrong, J.) and *People v. Pre* (2004) 117 Cal.App.4th 413, 425-426 (conc. & dis. opn. Of McIntyre, J.).  We conclude that, under the standards for establishing torture as set forth by California Supreme Court precedent, his argument is not well taken.
>
> In reviewing the sufficiency of the evidence to support a conviction, we determine "'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged.'" (*People v. Crittenden* (1994) 9 Cal.4th 83, 139, fn. 13, quoting *People v. Ainsworth* (1988) 45 Cal.3d 984, 1022.)  Under such standard, we review the facts adduced at trial in the light most favorable to the judgment, drawing all inferences in support of the judgment to determine whether there is substantial evidence or circumstantial evidence the defendant committed the charged crime.  (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496.)  The test is not whether the evidence proves guilt beyond a reasonable doubt, but whether substantial evidence, of credible and solid value, supports the jury's conclusions. (*People v. Mincey* (1992) 2 Cal.4th 408, 432.)
>
> In considering the sufficiency of the evidence, we cannot reweigh the evidence, as the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact.  (Evid. Code, § 312.)  Rather, we simply consider whether any rational trier of fact could have found the essential elements of the charged offenses beyond a reasonable doubt.  (*People v. Rich* (188) 45 Cal.3d 1036, 1081.)  Unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict," the conviction will not be reversed.  (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.)
>
> Section 206 provides that "[e]very person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury ... upon the person of another, is guilty of torture."  The intent necessary for torture, that is, to cause cruel or extreme pain, does not require that the defendant acted with premeditation or deliberation or had the intent to inflict prolonged pain.  (*People v. Hale* (1999) 75 Cal.App.4th 94, 107.)  Direct evidence of specific intent is rarely available, although the circumstances surrounding the offense or other circumstantial evidence may permit an inference that one acted with the intent to inflict cruel or extreme pain.  (*People v. Mincey*, *supra*, 2 Cal.4th at p. 433; *People v. Jung*, *supra*, 71 Cal.4th at p. 1043.)
>
> "[S]everity of a victim's wounds is not necessarily determinative of intent to torture" since "[s]evere wounds may be inflicted as a result of an explosion of violence [citation] or an 'act of animal fury'" rather than an intent to inflict pain for revenge, extortion, persuasion, or other sadistic purpose.  (*People v. Mincey*, *supra*, 2 Cal.4th at p. 432.)

"It does not follow, however, that because the severity of the victim's wounds is not necessarily determinative of the defendant's intent to torture, the nature of the victim's wounds cannot as a matter of law be probative of intent. Intent is a state of mind. A defendant's state of mind must, in the absence of the defendant's own statements, be established by the circumstances surrounding the commission of the offense. [Citation.] The condition of the victim's body may establish circumstantial evidence of the requisite intent." (*Id.* at p. 433.)

In this case, K.I. went to bed around 9:30 p.m. She awoke to find [Petitioner] naked and in her bed. K.I. asked him to leave, and as he started to get dressed, he asked her, "[W]ho's this Eddie?" K.I. explained that Eddie was a friend. In response, [Petitioner], "in one motion," grabbed her arm, pulled her close to him and punched her. The punch "shattered" the left side of her face and drove part of the orbital bone back into her skull. Blood came "pouring" from her face. [Petitioner] then pushed her onto the end of the bed, straddled her body and punched her head from side to side. [Petitioner] called her a "fucking bitch," "fucking whore" and told her "tonight you die. Tonight's the last night you'll ever see your babies again. Tonight you'll die." [Petitioner] continued to punch K.I., "dozens of times," and then started to choke and strangle her. She lost sensation in her arms. She was afraid she was going to die, and she then lost consciousness.

When she came to, [Petitioner] was on the bed "crouched ... on his haunches." [Petitioner] asked if she was going to attend a concert with him. She said no. By now her eyes were swollen shut. [Petitioner] punched her in her sides and ribs and again called her names. K.I. was eventually able to use her feet and push him off of her. She got off the bed and tried to run for the door, but [Petitioner] grabbed her by the hair and told her to "find your gun." Although K.I. no longer had a gun, she told [Petitioner] it was in the closet. [Petitioner] pulled everything from the closet and became "more angry" when he could not find it.

[Petitioner] began hitting K.I. again. While all of this was happening, K.I. was bleeding. She attempted to leave a "blood trail" because [Petitioner] told her this would be "the last night I would live, and I was just trying to leave a story for somebody so they knew every room I was in and they would have a story to follow, because I knew that night I was going to die."

[Petitioner] hit and punched K.I. and pushed her into the closet. He then stomped and kicked her back, neck, and ribs. She tried to roll to protect her ribs, but [Petitioner] grabbed her hair, stood her up, cussed at her, and demanded that she find the gun. K.I. bartered with [Petitioner] and told him that, if he left, she would say that two Black men came into her house and robbed and beat her. But [Petitioner] told K.I. she was lying and he knew she would call the police.

K.I.'s voice was hoarse and her throat swollen from being chocked. Her eyes were swollen shut. [Petitioner] continued to call her a whore and a bitch and tell her she was going to die. He insisted that she find the gun and wanted her to go into her daughter's room. She could not walk and fell. [Petitioner] continued to hold her by the hair, kicked her, and dragged her out of the bedroom. [Petitioner] dragged her into both her daughter's and son's rooms, looking for the gun.

While in K.I.'s daughter's room, [Petitioner] told K.I. she was lying and "fucking with" him. He threw her on the bed and said "tonight is the night you are going to know what it's like to be raped and violated." He then punched her, inserted two fingers into her vagina, and raped her. K.I. screamed, and [Petitioner] laughed. He repeated what he had said earlier, "tonight is the night you'll know

what it's like to be raped and violated." K.I. described the pain as "searing and burning." [Petitioner] chocked her again, and she soon passed out.

K.I. came to and [Petitioner] hit her with his fists.  He also bit her left nipple. [Petitioner] again demanded the gun.  K.I. asked that he call for an ambulance because she thought she was going to die.  He then pulled her by her hair onto the floor, dragged her out into the hall, and threw her onto her bed.  He became violent and angry, and again punched and choked her.  K.I. scratched [Petitioner's] face and chest, hoping to get some of his skin under her fingernails "for the police," although her hands were going numb.  She then blacked out.

When K.I. came to, [Petitioner] was still looking for the gun.  She tried to run out of the room, but [Petitioner] grabbed her by the hair, pushed her to the floor, and again told her she was going to die.  He choked her for the fourth time.  She tried to push him off of her, but he grabbed her by the hair.  He told her to "tell my son that at my funeral that I loved him and I was a good father to him."

K.I. fell asleep.  When she finally opened her eyes, she heard someone in the kitchen or living room.  She rolled off of the bed, held her eyes open with her hands, and made it out the back door.  She climbed a fence into her neighbors' yard, went into their house and asked them to call an ambulance.  It was after 1:00 a.m. when she entered the neighbors' house.

Police who responded to the scene described K.I. as having a bruised forehead, bruised and swollen eyes, blood dripping from the corner of her eyes, swollen lips, and dried blood around her nose and inside her mouth.  She had bruising and swelling on her neck, jaw, shoulders, chest, back and calf, and abrasions on her inner thighs.  She had difficulty breathing.  K.I.'s house was in disarray, and there was a large amount of blood in the bedroom.

As a result of the assault, K.I. suffered a collapsed lung, cephalohematoma, which is bruising and swelling in the head, concussion syndrome, a fracture of the face, bilateral subjunctival hematoma, which is bruising of the whites of her eyes, and multiple abrasions and contusions.  Since the assault, K.I. has had multiple eye surgeries, receives nerve blocks for pain, and suffers from headaches.

In *People v. Pre*, *supra*, 117 Cal.App.4th 413, the defendant made a similar argument to that here-that his torture conviction was not supported by the evidence. (*Id.* at p. 419.)  In *Pre*, the defendant forced his way into the victim's apartment. The defendant and victim struggled until she fell to the floor.  The defendant then choked the victim and dragged her to an area in the apartment where she could not be seen through a window.  He choked her until she lost consciousness.  When she came to, he was biting her ear.  He then chocked her until she passed out again. When she regained consciousness, the defendant was gone.  The victim suffered a fractured cheek, bite marks on her hand, an injury to her right temple and to an internal organ, and a fracture to a finger, which was later amputated.  The injury to her ear required over 100 stitches.  She had bruises on her breasts and back, and appeared to have another bite mark on her back.  (*Id.* at pp. 417-418.)

The court in *Pre* disagreed with the defendant and reasoned:

"While various intents could be ascribed to [the defendant's] initial entry and attack, once he had subdued [the victim] by choking her into unconsciousness, a reasonable jury could have concluded that his subsequent use of force against [the victim] was not pursuant to a need to subdue [the victim] as part of a belief in the

need for self-defense or pursuant to a robbery.  A reasonable jury could have concluded [the defendant] had neither intent; if [the defendant's] intent was self-defense or robbery, while [the victim] was unconscious he would have taken her purse and left or bound her while he ransacked the apartment. [The defendant] did neither.  Instead, while [the victim] was unconscious, he changed his position, cradled her head and shoulders in his lap, and proceeded to bit her ear.  He did not merely nibble her ear, a sensitive body part, but bit it so severely that he nearly bit through her ear. . . . This was bizarre conduct, not necessitated by any attempt to rob her or belief in self-defense.  A reasonable inference is that [the defendant] bit her ear pursuant to an intent to inflict extreme pain on his victim for his own sadistic pleasure. [¶]  Moreover, once [the victim] gained consciousness, [the defendant] choked her again until she passed out.  Further [the victim] suffered other injuries that she did not describe as occurring during the initial struggle, including what appears to be a bite mark on her back.  A reasonable jury could have concluded these injuries were inflicted when [the victim] was unconscious, that is, during a period when [the defendant] could have left the apartment if his intent had only been to take her purse or to defend himself against her attack and that these injuries were inflicted for the purpose of inflicting severe pain for revenge or [the defendant's] sadistic pleasure."  (*People v. Pre*, *supra*, 117 Cal.App.4th at p. 422.)

Here, as in *Pre*, the totality of the circumstances-including the level of violence, the nature of K.I.'s injuries, the manner and the length of time in which [Petitioner] inflicted them, the constant threats after questioning K.I.'s relationship with Eddie, and the callous indifference in the face of K.I.'s need for medical intervention-support the inference of an intent to cause severe pain for revenge or [Petitioner's] sadistic pleasure.  The evidence was abundantly sufficient to support [Petitioner's] conviction of torture.

(Ex. A, to Answer, at 10-16.)

As an initial matter, any challenge as to what constitutes torture under California law is not cognizable by way of section 2254.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam); Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005).

In addition, the California Court of Appeal's decision was a reasonable application of Jackson.  The evidence presented was sufficient to satisfy the elements and convict Petitioner of torture.  Petitioner initially punched the victim in the face so hard it caused the orbital bone to be pushed back into her skull.  He subsequently straddled her and punched her head repeatedly from side to side while calling her a "fucking bitch," "fucking whore," and telling her "tonight you die.  Tonight's the last night you'll ever see your babies again."  He continued to punch, choke and strangle her to the point she lost sensation in her arms and was unconscious a total of four times.  When she awoke, Petitioner punched her in the side and ribs.  She attempted to flee but Petitioner grabbed her by the hair and demanded she "find [her] gun."  Petitioner continued to punch and kick

1   the victim, pulling her by the hair as he beat and dragged her through the house in search for the

2   gun.  Her eyes were swollen shut and there was blood everywhere.  The beating continued over a

3   period of three and a half hours until the victim was able to escape to a neighbor's house.

4          When police arrived at the scene, the victim had a bruised forehead, bruised and swollen

5   eyes, blood dripping from the corner of her eyes, swollen lips, and dried blood around her nose and

6   inside her mouth.  The victim's injuries were severe and numerous.  She suffered a collapsed lung,

7   cephalohematoma (bruising and swelling in the head), concussion syndrome, a fracture of the face,

8   bilateral subjunctival hematoma (bruising of the whites of her eyes), and multiple abrasions and

9   contusions.  As a result of the assault, the victim has had multiple eye surgeries, receives nerve

10  blocks for pain, and suffers from headaches.

11         Given that the victim was repeatedly beaten over an extended period of time which

12  included breaks between the attacks in which Petitioner had time to reflect and resulted in

13  extensive injuries to the victim, any rational trier of fact could have found beyond a reasonable

14  doubt that Petitioner's continued attacks were done with the specific intent to cause cruel and

15  extreme pain on the victim.

16  VI.    Wheeler/Batson Challenge

17         Petitioner contends his due process right to a fair trial was violated by the prosecutor's use

18  of a peremptory challenge to remove a prospective Hispanic juror in violation of Batson v.

19  Kentucky, 476 U.S. 79 (1986).  The California Court of Appeal issued the last reasoned decision

20  denying the claim as follows:

21             [Petitioner] challenges the trial court's denial of his *Batson*/*Wheeler* motion
           with regard to a Hispanic prospective juror.  Hispanics are a cognizable group for
22         purposes of *Batson*/*Wheeler* analysis.  (*People v. Trevino* (1985) 39 Cal.3d 667,
           686, disapproved on other grounds in *People v. Johnson* (1989) 47 Cal.3d 1194,
23         1221.)

24             "The purpose of peremptory challenges is to allow a party to exclude
           prospective jurors who the party believes may be consciously or unconsciously
25         biased against him or her. [Citation.]"  (*People v. Jackson* (1992) 10 Cal.App.4th
           13, 17.)  Peremptory challenges may properly be used to remove jurors believed to
26         entertain specific bias, i.e., bias regarding the particular case on trial or the parties or
           witnesses thereto.  (*Wheeler*, *supra*, 22 Cal.3d at p. 274.)  However, "'[a]
27         prosecutor's use of peremptory challenges to strike prospective jurors on the basis
           of group bias-that is, bias against "members of an identifiable group distinguished
28         on racial, religious, ethnic, or similar grounds"-violates the right of a criminal

                                                14

defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. [Citations.] Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. [Citations.]' [Citation.]" (*People v. Bell* (2007) 40 Cal.4th 582, 596; see also *Batson*, *supra*, 476 U.S. at pp. 88-89; *Wheeler*, *supra*, at pp. 276-277.)

"The United States Supreme Court has recently reaffirmed that *Batson* states the procedure and standard to be sued by trial courts when motions challenging peremptory strikes are made. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 541, quoting *Johnson*, *supra*, 545 U.S. at p. 168, fn. omitted.)

The California Supreme Court has "endorsed the same three-part structure of proof for state constitutional claims. [Citations.]" (*People v. Bell*, *supra*, 40 Cal.4th at p. 596; see *Wheeler*, *supra*, 22 Cal.3d at pp. 280-282.)

With these principles in mind, we turn to the facts of the case before us.

During voir dire, defense counsel made a motion on Batson/Wheeler grounds, alleging that the prosecutor was "systematically excluding Hispanics." As argued by defense counsel, the prosecutor had exercised 10 peremptory challenges, three involving individuals with Hispanic surnames; juror Nos. 1390718, 1349172, and 1207916. According to defense counsel, the three "appear to be of Hispanic heritage," although he thought there "might be some question" with regard to juror No. 1390718. Defense counsel acknowledged that he, too, had excused a prospective Hispanic juror, "based on good cause," and there was one Hispanic juror currently seated in the box, but he argued that the challenges by the prosecutor suggested "some prima facie showing of statistical exclusion of Hispanics, and especially Hispanic males."

The trial court stated it would not "in the interest of time" make a determination of a prima facie showing but, instead, solicited a response from the prosecutor. The prosecutor explained:

"I excused Ms. (1390718) because her brother was accused of Molest, and she did not feel that the investigation was handled properly. I believe she is the juror that talked about the brother-or excuse me-not caring for the investigation, the brother's lawyer did [sic], if I recall from yesterday. That is why I excused her. [¶] With Mr. (1349172), he had the DUI [driving under the influence] conviction. He has a couple of nieces that may have been molested by a relative that's still an ongoing investigation, and I didn't feel this was an appropriate case for him. [¶] And as regard to Mr. (1207916), he was involved in a street fight where he was stabbed. And this is a case involving a lot of violence, and I did not feel that it would be appropriate for him to hear the evidence in this case based on what he went through recently."

The trial court then denied the motion, stating "both sides are entitled to a determination whether or not there is a prima facie case. I'll make that

15

determination.  If I get by a prima facie case, I find there is sufficient basis upon which to exercise peremptories as to those jurors."

[Petitioner's] argument focuses on the prosecutor's exercise of a peremptory challenge to excuse juror No. 1390718.  He contends the reasons given by the prosecutor do not withstand scrutiny under *Batson/Wheeler*.  We disagree.

The trial court, in essence, ruled for the defense in step one of the *Batson/Wheeler* analysis by asking the prosecutor to come forward with a race-neutral explanation as to each challenge, which is step two of the *Batson/Wheeler* analysis.  (See *People v. Silva* (2001) 25 Cal.4th 345, 384.)

"In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.... [¶] A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror.  At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation, the reason offered will be deemed race neutral."  (*Hernandez v. New York* (1991) 500 U.S. 352, 359-360 (plur. opn. of Kennedy, J.).)

At this step, the explanation need not be persuasive, or even plausible. (*Purkett v. Elem* (1995) 514 U.S. 765, 767-768.)

Here, the prosecutor stated race-neutral reasons with respect to each of the excused jurors: No. 1390718 (family member accused of molest); No. 1349172 (had a DUI and two nieces who were molested and the investigation was ongoing); and No. 1207916 (involved in a violent street fight).

At step three of the *Batson/Wheeler* analysis, the trial court must decide whether the opponent of the peremptory strike has proved purposeful racial discrimination by a preponderance of the evidence.  (*Purkett v. Elem*, *supra*, 514 U.S. at p. 767; *People v. Hutchins* (2007) 147 Cal.App.4th 992, 997-998.)  At this time point, the persuasiveness of the proffered justification becomes relevant (*Johnson*, *supra*, 545 U.S. at p. 171), as implausible or fantastic justification will often be found to be a pretext for purposeful discrimination.  (*Purkett v. Elem*, *supra*, at p. 768.)

But a prosecutor is presumed to use his or her peremptory challenges in a constitutional manner (*People v. Alvarez* (1996) 14 Cal.4th 155, 193; *Wheeler*, *supra*, 22 Cal.3d at p. 278), and the justification proffered for the particular excusal "need not support a challenge for cause, and even a 'trivial' reason, if genuine and neutral, will suffice. [Citations.]" (*People v. Arias* (1996) 13 Cal.4th 92, 136.) "What is required are reasonably specific and neutral explanations that are related to the particular case being tried."  (*People v. Johnson*, *supra*, 47 Cal.3d at p. 1218.)

"All that matters is that the prosecutor's reasons for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory.  '[A] "legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection. [Citations.]' [Citation.]" (*People v. Reynoso* (2003) 31 Cal.4th 903, 924, quoting *Purkett v. Elem*, *supra*, 514 U.S. at p. 769.)

Once the prosecutor "come[s] forward with an explanation that demonstrates a neutral explanation related to the particular case to be tried" (*People*

*v. Johnson, supra,* 47 Cal.3d at p. 1216), the trial court must satisfy itself that the explanation is genuine.  (*People v. Hall* (1983) 35 Cal.3d 161, 168.)  "In [this] process, the trial court must determine not only that a valid reason existed but also that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge."  (*People v. Fuentes* (1991) 54 Cal.3d 707, 720.)

"This demands of the trial judge a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily, for 'we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.' [Citation.]"  (*People v. Hall, supra,* 35 Cal.3d at pp. 167-168.)

"When a trial court has made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror, we accord deference to its ruling, reviewing it under the substantial evidence standard. [Citations.]"  (*People v. Jurado* (2006) 38 Cal.4th 72, 104-105.)  Deference does not, of course, "imply abandonment or abdication of judicial review."  (*Miller-El v. Cockrell* (2003 537 U.S. 322, 340.)

We find that substantial evidence supports the trial court's ruling with respect to juror No. 1390718.  When questioned, she stated that she had two nieces who were the victims of molestation by her brother.  The situation occurred six or seven years earlier, but had not gone to trial until three years ago.  Her brother was currently in prison.  This alone could serve as a valid race-neutral reason to excuse her.  (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1282 [prospective juror's relative's conviction of a crime was a proper consideration justifying peremptory challenge]; *People v. Dunn* (1995) 40 Cal.App.4th 1039, 1049 [prosecution properly challenged juror whose uncle had been convicted of murder].)  In addition, juror No. 1390718 expressed some animosity toward her brother's counsel for what she perceived based on a negative experience with law enforcement is a proper race-neutral reason.  (*People v. Turner* (1994) 8 Cal.4th 137, 171, overruled on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.)

[Petitioner] contends that the prosecutor's reasons were suspect because juror No. 1390718 appeared to be favorable to the prosecution.  The juror described herself as an elementary school administrator who frequently investigates possible cases of physical or sexual abuse involving children and reports them to child protective services.  She admitted that she was a "child advocate," biased in favor of the prosecution if the case involved a child, and she did not believe a victim's personality played a role in his or her victimization.  She also expressed positive experiences with law enforcement officers, as they regularly visited the school as part of the DARE (Drug Abuse Resistance Education) program and anti-gang events.  While juror No. 1390718 did express these sentiments, the prosecution may have felt they did not outweigh her opinions concerning her brother and the reasons for his conviction and incarceration.

[Petitioner] also argues that the prosecutor's reasons were suspect because juror No. 1390718 had circumstances similar to those of juror No. 1189714, who was seated after the *Batson/Wheeler* motion was denied.  Juror No. 1189714 stated he was "not sure the exact facts," but he had an uncle who was "apparently ... arrested for having a relationship with-it turned out to be a minor."  The uncle "served some time," then lost his residence, and was subsequently deported.  We

see a distinction between the two jurors. Juror No. 1189714 stated that "somebody" in the juror's family was of the opinion that the uncle had not received "very good representation in the legal process" but he himself had not formed any opinion about how the case was handled. The juror stated that he would not have any difficulties being fair to both sides in the current case, and his only bias would be that, growing up, his father "was big on never lay a hand on a woman. ... And on the case here, at least we know that much about it."

While juror No. 1390718 expressed some concern with the judicial process, juror No. 1189714 did not.

In addition, "[i]t is also common knowledge among trial lawyers that the same factors used in evaluating a juror may be given different weight depending on the number of peremptory challenges the lawyer has at the time of the exercise of the particular challenge and the number of challenges remaining with the other side. Near the end of the voir dire process a lawyer will naturally be more cautious about 'spending' his increasingly precious peremptory challenges. Thus at the beginning of voir dire the lawyer may exercise his challenges freely against a person who has had a minor adverse police contact and later be more hesitant with his challenges on that ground for fear that if he exhausts them too soon, he may be forced to go to trial with a juror who exhibits an even stronger bias." (*People v. Johnson*, *supra*, 47 Cal.3d at pp. 1220-1221.)

Juror No. 1390718 was questioned and excused on the first day of voir dire; juror No. 1189714 was questioned on the second day, near the end of the jury selection.

Finally, [Petitioner's] claim is undercut by the fact that the prosecutor also excused other non-Hispanic jurors who had similar circumstances to those of juror No. 1397018. The prosecutor excused juror No. 1168458, whose brother was accused of domestic violence, and she did not think he had been treated fairly by the police. And the prosecutor excused juror No. 1455062, who had a close family friend convicted of having sex with a minor, and who expressed some concern that the situation was "not handled as well as it could have been," although she thought she could be fair in considering the charges against [Petitioner].

In addition to juror No. 1390718, the other two prospective Hispanic jurors were excused for race-neutral reasons supported by the record, justifying the peremptory challenges. Juror No. 1349172 explained that he was convicted of a crime, as he had received a DUI in 2005. He also had a relative who was involved in a criminal investigation, as his mother's uncle was being investigated for molesting a niece. And juror No. 1207916, when asked if he had been the victim of any kind of violence, stated that he was in a street fight two years earlier and was jumped and stabbed. Although the case was reported to the police, no one was ever prosecuted.

Each of these reasons, individually or in the aggregate, suggests legitimate, race-neutral grounds upon which the prosecutor might have challenged the prospective jurors. We must give "great deference to the trial court in distinguishing bona fide reasons from sham excuses. [Citations.]" (*People v. Turner*, *supra*, 8 Cal.4th at p. 165.) The *Wheeler* court recognized that appellate courts can "rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." (*Wheeler*, *supra*, 22 Cal.3d at p. 282; see also *People v. Johnson*, *supra*, 47 Cal.3d at p. 1216.)

1
2
3          Given the substantial evidence standard of review, the burden on the
         opponent of the challenge, and the appropriate deference we must extend to the trial
         court, we conclude the peremptory challenges were proper and there is no
4        *Batson/Wheeler* error.

5   (Ex. A, to Answer, at 3-10.)

6          Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal

7   and state trials is governed by the standard established by the United States Supreme Court in

8   Batson v. Kentucky, 476 U.S. 79, 89 (1986).

9          In Batson, the United States Supreme Court set out a three-step process in the trial court to

10  determine whether a peremptory challenge is race-based in violation of the Equal Protection

11  Clause.  Purkett v. Elem, 514 U.S. 765, 767 (1995).  First, the defendant must make a prima facie

12  showing that the prosecutor has exercised a peremptory challenge on the basis of race. Id.  That is,

13  the defendant must demonstrate that the facts and circumstances of the case "raise an inference"

14  that the prosecution has excluded venire members from the petit jury on account of their race.  Id.

15  If a defendant makes this showing, the burden then shifts to the prosecution to provide a race-

16  neutral explanation for its challenge.  Id.  At this second step, "the issue is the facial validity of the

17  prosecutor's explanation.  Unless discriminatory intent is inherent in the prosecutor's explanation,

18  the reason offered will be deemed race neutral."  Id., quoting Hernandez v. New York, 500 U.S.

19  352, 260 (1991).  Finally, the third step requires the trial court to determine if the defendant has

20  proven purposeful discrimination.  And "[s]ince the trial judge's findings in the context under

21  consideration here largely turn on evaluation of credibility, a reviewing court ordinarily should

22  give those findings great deference."  Batson, 476 U.S. at 98, n. 21.

23         Petitioner contends the prosecutor's reasons were pretextual.  This allegation thus

24  implicates Batson's third step, where the court evaluates whether the defendant has met the burden

25  of showing purposeful discrimination in light of the proffered justifications.  Kesser v. Cambra,

26  465 F.3d 351, 359 (9th Cir. 2006) (en banc); Batson, 476 U.S. at 98.

27         In determining that the prosecutor had not engaged in purposeful discrimination under

28  Batson's third step, the state court also conducted a comparative juror analysis.  Comparative

1   analysis requires determining if other nonchallenged jurors possess any of the characteristics of

2   those on which the prosecutor challenged in the protected group.  Snyder v. Louisiana, 522 U.S.

3   472, 485 (2008).  In Snyder v. Louisiana, the Supreme Court stated that the third step of Batson

4   "involves an evaluation of the prosecutor's credibility," and "the best evidence of discriminatory

5   intent often will be the demeanor of the attorney who exercises the challenge."  Id. at 1208, 1213

6   (internal quotation marks and citation omitted).

7        Petitioner contends the trial court erred by failing to initially determine he made a "prima

8   facie" showing of discrimination.  Where, as here, "a prosecutor has offered a race-neutral

9   explanation for the peremptory challenges and the trial court has ruled on the ultimate question of

10  intentional discrimination, the preliminary issue of whether the defendant has made a prima facie

11  showing becomes moot."  Hernandez v. New York, 500 U.S. at 359.  This is so because by

12  articulating the reasons for exercising the peremptory challenge, the prosecutor does all that would

13  be required had a prima facie case been established.  Id.  Here, the question of whether Petitioner

14  established a prima facie case of discrimination is moot.  In response to Petitioner's Batson

15  challenges, the prosecutor articulated reasons for challenging the jurors at issue.  Nothing more

16  was required of the prosecutor to meet his burden had the trial court found a prima facie case been

17  established.  See Aikens, 460 U.S. at 715.

18       The Court of Appeal properly applied the Batson test in concluding that the trial court made

19  a sincere and reasoned effort to evaluate the prosecutor's race-neutral reasons for excusing the

20  challenged jurors.  The prosecutor explained that he struck Juror No. 1390718 because her two

21  nieces where victims of molestation by her brother and she did not feel the investigation was

22  handled properly.  Juror No. 1349172 had a DUI and two nieces who were molested and the

23  investigation was ongoing.  Juror No. 1207916 was involved in a violent street fight.  All of these

24  reasons were legitimate and race-neutral and were supported by the record during voir dire.

25       The state court also undertook a comparative analysis of other jurors who were not stricken

26  from the venire and rejected Petitioner's claim that the prosecutor's reasons were suspect because

27  Juror No. 1390718 had circumstances similar to those of Juror No. 1199714.  The Court noted

28  Juror No. 1189714 had not been stricken despite having an uncle who was arrested for having a

relationship with a minor.  However, Juror No. 1189714 stated that "someone" in her family was of the opinion that her uncle had not received very good legal representation, but he himself had not formed any opinion on how the case was handled.  Juror 1390718 expressed her own concern with the judicial process.  Furthermore, the prosecutor also excused other non-Hispanic jurors who had similar characteristics to Juror No. 1390718.  Juror No. 1168458 had a brother who was accused of domestic violence and she did not think he had been treated fairly by police.  Juror No. 1455062 had a close family friend convicted of having sex with a minor and expressed it was not handled as well as it could have been.

On direct review, the trial court's determination regarding the prosecutor's proffered reasons is entitled to "great deference," Batson, 476 U.S. at 98, n.21, and "must be sustained unless it is clearly erroneous."  Snyder v. Louisiana, 552 U.S. at 477.  On federal habeas review, "AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and "demands that state-court decisions be given the benefit of the doubt."  Felkner v. Jackson, __ U.S. __, 131 S.Ct. 1305, 179 L.Ed.2d 374 (2011), quoting Renico v. Lett, 559 U.S. __, __, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010).  In this case, the Court of Appeal's decision was not unreasonable, and the record did not reflect different treatment among similarly situated jurors.

VII.    Certificate of Appealability

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

   (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

   (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

   (c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

              (A) the final order in a habeas corpus proceeding in which the

detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000).  While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Petitioner has not made the required substantial showing of the denial of a constitutional right.  Accordingly, the Court declines to issue a certificate of appealability.

ORDER

Based on the foregoing, IT IS HEREBY ORDERED that:

1.     The instant petition for writ of habeas corpus be DENIED;

2.     The Clerk of Court be directed to enter judgment in favor of Respondent; and

3.     The Court declines to issue a certificate of appealability.

IT IS SO ORDERED.

**Dated:**   **March 5, 2012**          **/s/ Barbara A. McAuliffe**
                                                    UNITED STATES MAGISTRATE JUDGE

22